```
                                          Eastern District of Kentucky
       UNITED STATES DISTRICT COURT              FILED
       EASTERN DISTRICT OF KENTUCKY
              AT COVINGTON                     NOV 3 - 2005

                                                AT COVINGTON
                                               LESLIE G WHITMER
CIVIL ACTION NO. 2005-71 (WOB)              CLERK U S DISTRICT COURT

KENNETH CHANDLER, JR., ET AL                              PLAINTIFFS

VS.                        OPINION AND ORDER

LIBERTY MUTUAL INSURANCE GROUP                             DEFENDANT
```

This matter is before the court on the motion of defendant Liberty Mutual to dismiss or for summary judgment (Doc. #7); plaintiffs' motion for summary judgment (Doc. #11); and the motion for leave to intervene by Edmond Embry, et al (Doc. #14).

The court heard oral argument on these motions on Monday, October 31, 2005. Samuel Pipino and Kevin King represented plaintiffs. Charles Cassis and Jennifer Luhrs represented defendant. Lucinda Shirooni and Robert Blau represented the proposed intervening plaintiffs. Official court reporter Joan Averdick recorded the proceedings.

Having heard the parties, the court now issues the following opinion and order.

### FACTUAL AND PROCEDURAL BACKGROUND

A. **The Automobile Accident**

This is an insurance dispute that arises out of an automobile collision that occurred on June 6, 2002. Norma Young, Amber Young, Heather McNay, and Evan Embry were passengers in a minivan

traveling southbound on I-75 in Grant County, Kentucky.  A tractor-trailer driven by Kenneth Chandler was traveling northbound on I-75.  The tractor-trailer crossed the median and collided with the minivan, resulting in the deaths of Norma Young, Heather McNay, and Evan Embry.  Amber Young was injured.

### B. The Leasing Agreements and Insurance Policies

The tractor-trailer involved in this accident was owned by Dairy Farmers of America, Inc. ("DFA").  Through an equipment lease dated July 1, 2001, DFA leased the vehicle to Geo Transportation of Indiana ("Geo"), an independent contract hauler.  Through a "Fleet Operator Lease" of the same date, the vehicle, along with a driver, was then leased back to DFA.

In the Fleet Operator Lease, Geo ("Lessor") agreed to indemnify and hold DFA ("Lessee") harmless from all claims.  Geo also agreed to provide insurance totaling $11 million naming DFA as an additional insured.  The lease states that "any and all insurance" provided by DFA would be excess to Geo's coverage.

Thereafter, Geo procured two insurance policies.[1]  One was from Liberty Mutual -- a $2 million "Business Auto Policy" for the policy period July 1, 2001 to July 1, 2002 (the "Geo/Liberty Mutual policy").  The Geo/Liberty Mutual policy lists DFA as an additional insured.

---

[1]Attached to this opinion is a chart prepared by the court that depicts the fleet operator lease, the relevant lines of insurance coverage, and key provisions of those agreements.

2

The second policy Geo obtained was from American International Specialty Lines Insurance Company ("AISLIC") -- a $9 million commercial umbrella liability policy. This policy contains an "Other Insurance" clause which states that the policy will be excess to other insurance that covers the loss, but that such "Other Insurance" does not include, *inter alia*, "any policy of insurance specifically purchased to be excess of this policy."[2]

DFA also obtained from Liberty Mutual a $2 million "Motor Carrier Liability Policy of Insurance" effective for the same period (the "DFA/Liberty Mutual policy"). This policy includes "all lessors" as additional insureds. The policy also contains a clause entitled "Other Insurance -- Primary and Excess Insurance Provisions" which states, in pertinent part:

> While any covered "auto" is hired or borrowed by you from another "motor carrier" this Coverage Form's liability coverage is:
>
>> Excess over any other collectible insurance if a written agreement between the other "motor carrier" as the lessor and you as the lessee requires the lessor to hold you harmless.

(DFA/Liberty Mutual policy, Motor Carrier Coverage Form at 10)

Finally, National Union Fire Insurance Company of Pittsburgh

---

[2]The AISLIC policy contains an endorsement that <u>excludes</u> DFA from being an "Insured" under the policy. This would appear to be a breach of the Fleet Operator Lease between Geo and DFA, wherein Geo agreed to insure that DFA would be listed as an additional named insured on the policy(ies) providing the $11 million in insurance. The court does not opine herein how this complexity should be resolved in the wake of the court's ruling.

3

("National Union")[3] issued a $2 million commercial umbrella liability policy to DFA.  An endorsement to this policy entitled "Schedule of Underlying Insurance/Retained Limits" lists the auto insurance held by independent and contract haulers (i.e., such as Geo), and a hand-written notation states: "$11,000,000 each occ. The insureds $2,000,000 each Liberty Mutual Auto Liability Limits is xs of this $11,000,000 ea. Occ. limit."

The same broker procured all four of these policies.

On July 12, 2002, an action was filed in this court asserting three wrongful death claims, a personal injury claim, and four loss of consortium claims against Chandler, Geo, and DFA arising out of the automobile accident.  *Young, et al. v. Geo Transportation, et al.*, Cov. Civ. No. 02-172.

In the fall of 2003, during discovery in *Young*, the defendants there began settlement negotiations with Liberty Mutual.  Two of the wrongful death claims, a personal injury claim, and one loss of consortium claim were settled within the $2 million liability limit of the Geo/Liberty Mutual policy.

Recognizing that its policy limit was about to be exhausted, Liberty Mutual tendered defense and indemnity obligations to AISLIC under Geo's $9 million AISLIC umbrella policy.  By letter dated October 21, 2003, AISLIC advised that it was willing to take over

---

[3]AISLIC and National Union are both American International Group ("AIG") companies.

4

defense of the case if Liberty Mutual turned over the remainder of its $2 million limit and agreed to a cost-sharing arrangement for defense costs.

Liberty Mutual agreed to turn over its remaining limits but rejected the proposed cost-sharing arrangement. AISLIC then rejected the tender of defense of the case. These letters all refer to the "$2 million in underlying limits" of Geo's Liberty Mutual policy.

Subsequently, AISLIC took the position that the umbrella policy it issued to Geo was excess not only to Geo's Liberty Mutual policy, but also to the Liberty Mutual policy held by DFA.

On April 20, 2005, Chandler, Geo and AISLIC filed the instant declaratory judgment action seeking a declaration that Liberty Mutual is obligated to afford coverage to Chandler and Geo under the DFA/Liberty Mutual policy on a primary basis to any excess coverage afforded by AISLIC. Both parties have now moved for summary judgment.

### *ANALYSIS*

#### A. Policy Language

The AISLIC "Umbrella Elite" commercial liability policy issued to Geo states in its Insuring Agreement:

> We will pay on behalf of the **Insured** those sums in excess of the total applicable limits of **Scheduled Underlying Insurance** that the **Insured** becomes legally obligated to pay as damages, provided the damages would be covered by **Scheduled Underlying Insurance**, except for exhaustion of the total applicable

limits of **Scheduled Underlying Insurance** by the payment of **Loss**.

The "Schedule of Underlying Insurance" attached to this policy lists only the Liberty Mutual/Geo policy (No. AS2-641-004282-031) as underlying auto liability insurance to which the umbrella policy is excess. Therefore, the Liberty Mutual/DFA policy is not designated as underlying insurance by the Insuring Agreement of the AISLIC policy.

AISLIC argues instead that the Liberty Mutual/DFA policy is implicated by the "Other Insurance" clause of the umbrella policy:

> If other valid and collectible insurance applies to damages that are also covered by this policy, this policy will apply excess of the **Other Insurance**. However, this provision will not apply if the **Other Insurance** is specifically written to be excess of this policy.

In the "Definitions" section of the policy, "Other Insurance" is defined as follows:

> **Other Insurance** under Coverages A and B means a policy of insurance providing coverage for damages covered in whole or in part by this policy.
>
> However, **Other Insurance** does not include **Scheduled Underlying Insurance**, the **Self-Insured Retention** or any policy of insurance **specifically purchased to be excess** of this policy affording coverage that this policy also affords.

The question thus becomes: Was the Liberty Mutual/DFA policy specifically purchased to be excess to the AISLIC umbrella policy issued to Geo? This question may be answered by examining the language of the two policies themselves.

First, as already noted, the "Schedule of Underlying

6

Insurance" in the AISLIC policy lists only Geo's underlying Liberty Mutual policy. Had AISLIC believed that any coverage available to DFA should also be exhausted before its umbrella policy would be triggered, AISLIC presumably would have included the DFA/Liberty Mutual policy in this schedule. The same broker structured all of this coverage, including both Liberty Mutual policies and both umbrella policies. Thus, the fact that AISLIC did not list the DFA/Liberty Mutual policy in this schedule suggests that it was aware that that policy was meant to be excess to all coverage held by Geo, including the umbrella policy.

Second, the language of the DFA/Liberty Mutual policy clearly indicates that it was "purchased to be excess" to the AISLIC policy. Although leased autos generally are covered under the policy, as plaintiffs argue, that coverage is nonetheless qualified by the "Other Insurance -- Primary and Excess Insurance Provisions" clause, which states:

> While any covered "auto" is hired or borrowed by you from another "motor carrier" this Coverage Form's liability coverage is:
>
> > <u>Excess over any other collectible insurance if a written agreement between the other "motor carrier" as the lessor and you as the lessee requires the lessor to hold you harmless.</u>

The Fleet Operator Lease between Geo and DFA, which contains a broad indemnity clause, is precisely such an agreement. Thus, the plain language of the DFA/Liberty Mutual policy indicates that it was indeed "purchased to be excess" to all other collectible

7

coverage available to Geo.

Moreover, as defendant correctly notes, the language of the AISLIC policy itself ("purchased to be excess") invites an examination of the facts and circumstances surrounding the issuance of these policies to determine the parties' intent regarding their coverage.

AISLIC does not contest that this scheme of insurance was purchased to satisfy the obligations created by the Fleet Operator Lease between Geo and DFA.  That agreement confirms the intended priority of these policies.  In the Lease, Geo agreed to purchase a total of $11 million in insurance; it agreed to ensure that DFA was made an insured under that coverage; it further agreed that "any and all insurance" available to DFA (as lessee) would be excess to coverage procured by Geo (as lessor); and it agreed to indemnify and hold DFA harmless from any and all claims arising out of the acts or omissions of Geo, its agents, servants, or employees.

The intended structure of this scheme of insurance is further evidenced by an endorsement that was hand-written by an AIG representative and incorporated into the umbrella policy that National Union issued to DFA.  This endorsement lists as underlying insurance the auto policies of DFA's independent and contract haulers (i.e., such as Geo), stating that DFA's "$2,000,000 each Liberty Mutual Auto Liability is Excess of this $11,000,000 Each

8

Occurrence limit." This $11 million figure represents the total amount of coverage Geo was contractually obligated to provide pursuant to the Fleet Operator Lease, that is, the $2 million Liberty Mutual policy and the $9 million AISLIC policy.

Thus, this endorsement also supports the conclusion that, at the time these various policies were purchased, AISLIC was aware of the arrangement between DFA and Geo and understood that DFA's insurance was to be excess to both the primary and umbrella policies held by Geo.

Finally, the course of correspondence between AISLIC and Liberty Mutual following Liberty Mutual's tender of the defense of this case also supports this result. AISLIC never stated, in response to Liberty Mutual's tender, that its umbrella policy was excess to the DFA/Liberty Mutual policy. To the contrary, AISLIC's letters assume that the only policy that had to be exhausted was the Geo/Liberty Mutual policy, but that AISLIC would not yet accept defense of the case because the full $2 million limit of that policy had not yet been paid out. AISLIC expressly stated that once that policy was exhausted and paid out, then AISLIC's duty to defend would be triggered. Clearly, had AISLIC believed that the DFA policy was next in line, it would have said so in response to Liberty Mutual's tender.

9

B.  **"Excess v. Primary" Argument: Relevance of the Indemnity Agreement**

Plaintiffs argue that the Fleet Operator Lease between Geo and DFA is irrelevant extrinsic evidence which may not be considered. However, the majority of courts appear to have held that such an indemnity agreement is not only relevant, but pivotal to the "excess v. primary" coverage analysis. *See, e.g., St. Paul Fire & Marine Ins. Co. v. American Int'l Specialty Lines Ins. Co.*, 365 F.3d 263, 270 (4th Cir. 2004) (holding that an indemnity agreement between insureds controls in an insurance priority dispute, noting that parties procured the lines of insurance pursuant to agreement); *American Indemnity Lloyds v. Travelers Property & Casualty Ins.*, 335 F.3d 429, 436 (5th Cir. 2003) (similar); *Wal-Mart Stores, Inc. v. RLI Ins. Co.*, 292 F.3d 583, 587-93 (8th Cir. 2002) (indemnification provisions in contract between supplier and retailer obligated supplier to protect retailer and its primary insurer from liability arising from settlement of products liability action); *Chubb Ins. Co. of Canada v. Mid-Continent Casualty Co.*, 982 F. Supp. 435, 438 (S.D. Miss. 1997) (indemnity agreement controls parties' rights and liabilities to each other, which determine insurance coverage); *Federal Ins. Co. v. Gulf Ins. Co.*, 162 S.W.3d 160, 166 (Mo. App. 2005) (indemnity agreement is relevant in coverage dispute and under circumstances of case it controls obligations of parties' insurers).

10

As these cases make clear, whether a policy is "excess" or "primary" depends not on the labels attached to them, but rather on a determination of who is required to pay first. *Wal-Mart*, 292 F.3d at 590. Where there is an indemnity agreement that sets forth the parties' obligations to one another, that agreement must be consulted and will usually determine the allocation of liability in an insurance dispute. *Id.* at 588.

In *Wal-Mart*, the retailer entered into a vendor agreement with Cheyenne, a distributor, under which Cheyenne would supply halogen lamps to Wal-Mart. The agreement required Cheyenne to indemnify Wal-Mart for any liability arising from Wal-Mart's sale of the lamps. The agreement also required Cheyenne to provide at least $2 million in liability insurance. Cheyenne procured two policies: a $1 million primary policy through St. Paul and $10 million "excess" policy through RLI. Wal-Mart was a covered insured under both policies. Wal-Mart had its own insurer, National Union, which covered it with a $10 million limit.

After one of the lamps malfunctioned, the injured plaintiff sued Wal-Mart and Cheyenne in state court, and that suit was settled for $11 million. All parties agreed that St. Paul was liable for the first $1 million, but they disputed whether RLI was next in line ahead of Wal-Mart's policy with National Union.

Wal-Mart and National Union brought a declaratory judgment action in federal court seeking resolution of the coverage dispute.

11

Although the RLI policy had a blanket "Other Insurance" clause stating that all other coverage must be exhausted before RLI could become liable, the Eighth Circuit held that the indemnity agreement between Wal-Mart and Cheyenne, not the "Other Insurance" clause, controlled. *Id.* at 587.

The court rejected RLI's argument that the indemnity agreement could not be considered:

> Notwithstanding Cheyenne's obligation, RLI urges this Court that the indemnification provision is irrelevant to this case. It contends that only the language of insurance policies determine[s] the priority of payment between insurers. We reject this argument. "[C]ourts will assess whether the factual circumstances create a relationship between the indemnity contract and the insurance allocation issues." . . . We find no authority for the proposition that a court may never consider an indemnity clause in determining liability for a settlement.

*Id.* at 588 (internal quotations and citations omitted).

The Eighth Circuit noted that, as in the case at bar, the contract between the insureds required the insurance arrangements at issue. *Id.* Further, the court rejected RLI's argument that the lower premiums it charged weighed against it being next in line ahead of National Union, a "primary" insurer. The court noted that the lower premiums merely reflected, accurately, that RLI was excess to Cheyenne's primary coverage through St. Paul, and that RLI had received the benefit of that risk calculation. *Id.* at 593.

Similarly here, AISLIC's argument that the lower premium on its policy indicates that it should not be ahead of the DFA/Liberty Mutual policy is not well-taken. AISLIC has received the benefit

12

of being excess to the Geo/Liberty Mutual policy, which will already have paid out its $2 million limit before the AISLIC policy will be required to pay. AISLIC has produced no evidence that, in pricing its premium, it believed that its policy would be excess to any other policy, including any coverage held by DFA.

Therefore, based both on the plain language of the AISLIC and DFA/Liberty Mutual policies, as well as on the indemnity agreement and other evidence, the court concludes that the DFA/Liberty Mutual policy was "purchased to be excess" to all coverage available to Geo, including the AISLIC umbrella policy. Under its Insuring Agreement, therefore, the AISLIC policy is next in line once the Geo/Liberty Mutual policy limit is exhausted.[4]

Therefore, having heard the parties, and the court being otherwise advised,

**IT IS ORDERED** that: (1) defendant Liberty Mutual's motion to dismiss or for summary judgment (Doc. #7) be, and is hereby, **GRANTED** as to Count II of the complaint; (2) Count I of the complaint be, and is hereby, **DISMISSED WITHOUT PREJUDICE;** (3) plaintiffs' cross-motion for summary judgment (Doc. #11) be, and is hereby, **DENIED;** and (4) the proposed intervening plaintiffs having

---

[4]This disposes of Count II of plaintiffs' complaint. Count I, which seeks a declaration that Chandler and Geo are "insureds" under the DFA/Liberty Mutual policy, is not ripe because that policy may not ever be triggered as to Chandler and Geo due to the high limit of the AISLIC policy.

13

stated their desire to withdraw their motion to intervene, that motion (Doc. #14) be, and is hereby, **DENIED AS MOOT**.

A separate judgment shall enter concurrently herewith.

This 3(1) day of November, 2005.

_William O. Bertelsman_
**WILLIAM O. BERTELSMAN, JUDGE**

tic: 21 min.

14